E. I. du PONT de NEMOURS AND COMPANY, Plaintiff-Appellant,

v.

UNION CARBIDE CORPORATION, Defendant-Appellee.

No. 15678.

United States Court of Appeals Seventh Circuit.

Nov. 15, 1966.

Rehearing Denied Jan. 6, 1967.

8. See also United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

Frank F. Fowle, Chicago, Ill., Ralph L. Chappell, New York City, E. Manning Giles, Michael A. Warner, Chicago, Ill., for appellant, Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., Kenyon & Kenyon, James H. Callahan, New York City, of counsel.

Sidney Neuman, Victor Myer, Joseph P. Calabrese, Robert L. Austin, James R. Dowdall, Chicago, Ill., for appellee.

Before DUFFY, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

DUFFY, Senior Circuit Judge.

Plaintiff (du Pont) brought this suit against defendant (Carbide) for alleged infringement of three patents owned by du Pont. Carbide answered as to two of the patents. The third patent was United States Patent No. 3,018,189 issued to George W. Traver (Traver) on January 23, 1962, for a "Method of Conditioning Polyethylene Surfaces for the Adhesion of Materials Coated Thereon and Resulting Product." Carbide moved for summary judgment as to the Traver patent.

The District Court granted summary judgment holding Traver Patent No. 3,018,189 invalid under 35 U.S.C. § 102 (b) on the ground that the invention claimed in that patent was in public use or on sale more than one year prior to the date of an effective application for the patent.

The Court held that this issue had been resolved against du Pont by findings in an earlier case in another court between the same parties, and, because of the doctrine of collateral estoppel, could not be re-litigated in the case at bar.

The earlier case was a civil action brought under 35 U.S.C. § 146. It was brought to review a Patent Office decision holding Traver to be the first inventor of an invention also claimed by Carbide. The case was heard by Judge Frederick O. Mercer at Peoria, Illinois. Judge Mercer concluded, as had the Patent Office, that Traver was the first inventor. He caused judgment to be entered in favor of Traver and du Pont and against Carbide. Union Carbide Corp. v. Traver Investments, Inc., S.D. Ill., (1965), 238 F.Supp. 540. This earlier case often is referred to in the briefs as the "Peoria case."[1] The case on which this instant appeal is based is sometimes referred to as the "Chicago case."

For many years, polyethylene film has been an important commercial plastic. Hundreds of millions of pounds have been

1. In the Peoria case which had been brought by another applicant against Traver and Carbide, du Pont intervened and became an additional defendant. For convenience, when the original plaintiff's complaint was dismissed, the parties were realigned by the Court to treat Carbide as the plaintiff and Traver and du Pont as the defendants. 238 F.Supp. at 540, n. 1.

sold annually in the United States. A typical use of the material is the transparent garment bag used by drycleaners.

Prior to 1949, it was recognized that the surface of the polyethylene film as then manufactured would not retain ink. Printed matter could be placed thereon, but the ink would flake off and wash away when exposed to moisture. The entire polyethylene industry sought to find some way to improve ink retention. All those interested regarded such retention as necessary so that ornamentation and advertising could be applied to and retained on the film.

In 1949, Traver conceived the idea of treating polyethylene film with the electrical discharge from a tubular gas-filled lamp, in order to make the film more ink retentive. He experimented with a metal roller, an argon-filled tubular lamp spaced from the roller, and a transformer having its secondary coil in circuit with the lamp and the roller, so as to produce an electrostatic discharge from the lamp to the roller.

Traver discovered that by passing polyethylene film over the roller and exposing it to a discharge of sufficient intensity from the lamp for a sufficient period of time, the film would retain subsequently applied printing ink.

By December 1949, Traver achieved successful treatment with a continuous-process treatment machine which was necessary for commercial exploitation. In March 1950, he delivered his first order for commercial use.

On October 26, 1950, Traver filed his earliest patent application. His claims define the invention broadly in terms of exposing the surface of polyethylene to the action of electrostatic discharge. Traver filed second and third applications in 1952 and 1953 respectively, as continuations-in-part of the 1950 application. The claims of these applications continued to define his invention as sub-

jecting polyethylene film to the action of electrostatic discharge.

The Patent Office suggested other applicants copy Traver's Claim 16 for the purpose of setting up an interference. The other applicants did so. The Patent Office then instituted an interference proceeding to determine which applicant was the first inventor. The Adams and Wakefield application was assigned to Carbide.

Carbide moved to amend the interference issue by substituting the following claims from its own application:

"The method of treating a polyethylene body to render a surface thereof adherent to ink impressions subsequently imprinted thereon which consists of subjecting the surface of the body to high voltage electric stress accompanied by corona discharge to improve its bonding properties whereby upon printing said treated surface the ink impressions strongly adhere thereto." [2]

The Patent Office re-defined the issue for purpose of interference in three claims or "counts." Each of the three counts incorporated the narrower term "corona discharge." All three interfering applicants adopted these counts.

On July 25, 1960, the Board of Patent Interferences decided Traver was entitled to an award of priority of invention defined in terms of corona discharge by reason of an actual reduction to practice at least by March 4, 1950.

On November 17, 1961, Traver amended his application so as to eliminate from the claims any reference to corona discharge and to reinstate the claim language he had used in his 1950 application. Claim 36 of the amended application (later Claim 1 of the Patent) defined the invention as

"The method of treating a polyethylene body to render a surface thereof adherent to printing ink,

---

**2.** "Corona" is a bluish glow sometimes noted in connection with electrical dis- charges when they reach a sufficient intensity.

which consists in subjecting said surface to the action of electrostatic discharge while employing an alternating current, to render said treated surface receptive and strongly adherent to printing ink."

These are the claims of the patent in suit and which are now before us.

Following the amendment, the Patent Office held that the new claims were adequately supported by the 1950 application, which had been filed less than one year after the alleged public use, and dismissed the petition to institute public use proceedings which had been filed by one of the applicants.

Traver's 1953 application finally issued on January 23, 1962 as Patent No. 3,018,189. In the meantime, suit had been brought in Peoria under 35 U.S.C. § 146 to review the action of the Patent Office with respect to the interference, seeking a judicial determination that Carbide's applicants and not Traver were the first inventors.

Although Judge Mercer decided the issue before him, i. e. priority, in favor of Traver, his opinion indicates that at some time or times during the ten-day trial, he had some doubts on the subject. During the trial, Carbide continuously and strenuously attempted to persuade the Court that Traver had not been the first inventor of the corona discharge process.

Judge Mercer's opinion describes his doubts, and although he resolved them in favor of Traver, he made certain observations or findings in the process of resolving them that became the basis for Carbide's motion for summary judgment, as well as the basis for the decision of the District Court in the instant case, which determined that such findings in the Peoria case created a collateral estoppel in the case at bar.

Judge Mercer stated—"At first blush one wonders why the corona discharge

principle was not part of the first Traver application if, in fact, the process had been conceived and reduced to practice by him."

Judge Mercer further stated—"Digressing, it seems singular that the Traver Corp. employees kept no log or record of their experimentation with the process. That fact, coupled with the fact, to which allusion was previously made, that Traver's 1950 application described an unworkable method, tends to cast doubt upon the credibility, or memory, of the Traver Corp. employees above mentioned." However, as stated heretofore, Judge Mercer resolved his doubts in favor of Traver.[3]

With the judgment in its favor, du Pont did not appeal. However, it took exception to the statement "that Traver's 1950 application described an unworkable method." Its motion to strike this statement was denied.

As stated, the District Court, in the instant case, applied the rule of collateral estoppel in determining that the patent in issue was in public use more than one year prior to the date of an effective application for the patent. The Court below relied on a "finding" in the Peoria case, which hereinbefore has been stated.

■■ A finding must be essential to a judgment before it can be given collateral estoppel effect in a later suit. The Supreme Court has stated:

"That doctrine [collateral estoppel] makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision."

Yates v. United States, 354 U.S. 298, 336, 77 S.Ct. 1064, 1068, 1 L.Ed.2d 1356. See also, 1B Moore, Federal Practice ¶ 0.441(2) at 3777 (2d ed. 1965).

The issue that was litigated in the Peoria case was whether the Patent Office had erred in determining that Traver

3. This doubt was disspelled by other evidence, Judge Mercer said, particularly by the testimony of Carbide employees that one of them had visited Traver's place of business in December 1949 and had twice been shown the Traver machine and process in successful operation, and had carried news of the development back to Carbide management.

was the first to reduce to practice the invention described in the interference counts. Judge Mercer said, in his opinion—"No other issue can arise in this litigation until and unless it be determined that plaintiff [Carbide] is entitled to prevail." Of course, Carbide did not prevail. Judge Mercer's opinion continued—"No issue can arise as to the sufficiency of the Traver application or as to the validity of the Traver patent. The scope of the proceeding is limited by the provisions of the statute."

Carbide's counsel do not accept the rule of essentiality to the judgment. They refer to it as a "text writer's rule" and quote from opinions of the Second Circuit by Judge Learned Hand. However, in Harries v. Air King Products Co., 2 Cir. (1950), 183 F.2d 158, 161, Judge Hand said:

"In Thomas & Betts Co. v. Electrical Fittings Corp., 2 Cir., 100 F.2d 403, we held that, after deciding that a defendant did not infringe a claim, we need not pass upon a finding of the district court that it was valid. This we held because the finding had not been necessary to the judgment and for that reason would not be an estoppel, and would not therefore prejudice the defendant."

In granting Traver's motion to strike from Carbide's complaint all allegations and prayers that the Traver patent was subject to a public use bar under 35 U.S.C. § 102(b), Judge Mercer said:

"Neither the legal sufficiency of the Traver application nor the validity of the patent issued thereon is an issue in this case. * * * Plaintiff * * * may not litigate the validity of its opponent's patent under Section 146."

Carbide, in effect, argues for a broader interpretation of collateral estoppel than heretofore has been sanctioned by the courts. Carbide argues that the estoppel effect of Judge Mercer's decision should be determined not solely by the judgment which was entered in that case, but also by the issues that he decided. Carbide also argues that du Pont, although the winning party in the Peoria case, could have had an appellate review of the adverse finding made by Judge Mercer.

We disagree with these contentions of Carbide's counsel. We think the doctrine of collateral estoppel has been erroneously applied by the District Court in this case.

We think Judge Mercer did not intend to and did not deal with the question of whether Traver's 1952 application was a valid continuation-in-part of his 1950 application. Judge Mercer repeatedly stated that he would not deal with issues relating to the validity of the Traver patent.

Judge Mercer's interest in Traver's 1950 application was not its sufficiency under 35 U.S.C. §§ 112 or 120, but whether, as urged by Carbide, it cast sufficient doubt on the credibility of Traver's witnesses to warrant disbelieving them. It is difficult to believe that Judge Mercer was determining that Traver's 1950 application was deficient for continuation-in-part purposes when he expressly stated he would not rule on that question.

■ We hold it was error for the District Court in this case to grant summary judgment for Carbide upon a suit claiming infringement of the Traver patent.

The judgment of the District Court is reversed and remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.